[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceeding
Three years after being placed in foster care, and nearly two years after their mother's last visit, Robert T., Jr., born December 20, 1983, and Michael R., born April 13, 1985, became subjects of petitions to terminate their parents' rights filed by the Department of Children and Youth Services (DCYS) pursuant to 17a-112 of the Conn. Gen. Statutes (Rev. 1991) applicable to children previously committed, as were these children on April 18, 1988, to the petitioner as neglected or uncared for. Their mother, Ethel R. having been served in hand for the initial hearing on March 26, 1991, appeared with counsel and denied the alleged grounds for terminating her parental rights. The named father of Robert T. Sr., had been served by publication, his whereabouts having been unknown for more than a year, and failed to appear for this and all subsequent hearings on the petition regarding his son.
After the first trial day, on April 26, 1991, after all parties had rested, all three grounds pleaded as to Robert T., Sr. were established by default: Abandonment; failure to rehabilitate; no ongoing parent-child relationship, all as defined in subsection (b) of 17a-112. Only the latter ground CT Page 523 was found, by clear and convincing evidence, as to the mother, I the other two grounds being dismissed for failure to be established by the necessary clear and convincing proof: While Ethel had not seen her sons since August of 1989, the failure of DCYS to provide, offer, or facilitate transportation to the town where the foster home was located precluded the conclusion of abandonment, and the record established that she had secured housing in her own name six months before initiation of this action, had manifested no signs of recurring substance abuse, and had visited her sons every time the DCYS worker offered transportation (twice since January of 1988) which precluded a finding of failure to rehabilitate. The court found, however, that no parent-child relationship presently existed between Ethel and these children. Whether or not it would be detrimental to the children to permit still further time to elapse for the reestablishment of such relationship, however, could not be determined without an updated clinical evaluation. Since none of the parties had moved for such evaluation, the court, on its own motion, ordered that it be conducted by the same clinician who had seen the family three years earlier, and the matter was continued for this purpose.
This evaluation was conducted in May of 1991 and introduced at a continued trial date of July 23, 1991. A further continuance was necessitated by the unavailability of the clinical evaluator in July. The matter was continued still further due to the birth of Ethel's seventh child on August 17, 1991. All necessary parties were present at the final trial date of September 6, 1991, and the parties were given to October 1, 1991 for the filing of trial memoranda. The date the reserved decision commences is thus October 1, 1991.
Facts
Evidence offered at trial, interpreted in the light of the prior record in this court concerning these children and their parents, supports the finding of the following facts:
Ethel R. was 25 years old and unmarried when she gave birth to Robert T. Jr., her fourth child, on December 20, 1983. Michael was born less than 16 months thereafter. Although DCYS received numerous referrals on the care she provided these children between October of 1984 and December of 1987 (State's Exhibit A., p. 35), nothing was done to intervene until January 21, 1988 when the mother herself requested foster care for them. They were placed in a foster home in Cromwell, Conn., where they have resided ever since. On April 18, 1988 Ethel CT Page 524 appeared in court in response to a neglect petition that had been filed on behalf of her children. Represented by counsel, she admitted the allegations of past neglect and agreed that the children could be committed to DCYS for an initial period of 18 months, pursuant to subsection (d) of 46b-1229.
She also agreed with and signed a written document, not offered into evidence by the petitioner but a part of the court record, which listed the court's expectations for reunification. These included cooperation with DCYS, acceptance of any services offered by DCYS and keeping DCYS informed of her changes of address. She was to cooperate with a clinical evaluation and to follow any recommendations therein. She was also expected to secure adequate housing. Six weeks later, by June 1, 1988, Ethel had moved to an undisclosed address and DCYS was unable to locate her.
In his evaluation of May 6, 1988 (State's Exhibit H) the court-appointed clinical evaluator had found that Ethel's psyche was "seriously impaired", that she was leading a "chaotic, wayward life", and was a "poor historian of marginal psychological characteristics who is likely to be mentally ill." (Id., p. 5.) He found the children "to be educationally delayed", most probably because of having been "understimulated and insufficiently supervised while in their mother's care". He found, however, that after four months of foster placement, they still retained "some sense of attachment and connection with their biological mother and appear to be greatly appreciative for any benefit she may offer to them, in reality or promise". (Id.) He recommended a substance abuse assessment and adherence to recommended treatment, and suggested psycho-educational evaluations of the children. (Id.)
He concluded:
 The children should not be encouraged to believe that they are likely to experience an early return to the custodial care of their mother since she is presenting with chronic attributes of inadequacy and illness that are likely to preclude the possibility of her exercising a viable parental role in her children's lives for some time. (Id. at p. 6)
When a younger child, born in February of 1988, was committed to DCYS six months later (October 18, 1988), no counseling was recommended for the mother, presumably because the psychologist's recommendation for a substance abuse assessment had not been secured, or, if secured, had not recommended treatment. CT Page 525
Although required by subsection (e) of 46-129 to file a petition to extend commitments 90 days before they expire, DCYS did not do so until September 19, 1989 — fully two months late. At that time, the whereabouts of the mother as well as of Robert's father were unknown. Notwithstanding this fact, and the additional fact that the boys had then been in foster care for over 20 months, DCYS offered no permanency plan other than continued foster care. The commitment was extended by default to April 18, 1992 with DCYS ordered to file another extension petition by January 18, 1992 if the children continued to be, by that date, wards of the State of Connecticut.
Six months after the extension of commitment hearing on October 10, 1989, Ethel reappeared in court on a similar petition regarding her youngest child.
She agreed that that baby's commitment could be extended and to a list of expectations similar to those articulated earlier for Robert and Michael. Again, no counselling was required for substance abuse or otherwise. She agreed to regular visits with that child, maintenance of contact with DCYS and the securing of adequate and stable housing. When these expectations went unfulfilled, DCYS filed a petition to terminate parental rights, and, following a default trial on January 25, 1991, the requested relief was granted. Ethel had been personally served for that proceeding but had not appeared. Two months later, however, she did appear in court at the initial hearing on the instant petitions, which had been filed on February 26, 1991, and at every subsequent hearing thereafter, except when medically excused.
When the same psychologist who had seen the family in May of 1988 met them three years later, he asked Ethel why there had been so little contact with her sons — two visits; no cards, gifts, letters or phone calls at birthdays or Christmas — during that period. She ". . . replied that she is just trying to get her life together, and that there is not much that she can do with her children." (State's Exhibit B., p. 6. She reported 12 pregnancies, seven live births, a history of psychiatric hospitalization, cocaine abuse and alcohol treatment. She could not estimate the number of times she had been arrested but guessed she had been in jail 10 or more times, always for brief periods (Id.)
Seen together, "Neither child displayed any kind of recognition of their mother." (Id. p. 8) After the visit, "Both boys stated that they did not remember their mother. . . They did not remember what she looked like before this meeting." The evaluator found Ethel to be a "depressively CT Page 526 inclined person with a chaotic pattern to adult life, a pattern containing antisocial features," (Id., p. 9.) emotionally depleted by a life lived irresponsibly, antisocially and "marred in the past by serious drug abuse." (Id. pp. 10-11.) He found no relationship existed between the mother and the children ". . . [who] had factually forgotten her." Id. p. 10.) Based on observing the "warm and nurturant" connection with their foster mother, the psychologist concluded that the foster parents were the psychological parents of both children, and "that it is clearly in the interest of the children to remain in their present foster home" since there was ". . . little promise that she [Ethel] might rehabilitate to a point that would enable her to play a meaningful role in the lives of her sons." Because of this, he advised against encouraging visitation, after the nearly two years since their last encounter in August of 1989. Whether or not foster parents could be approved as the adoptive family for these children, the evaluator considered that it would be ". . . problematic to consider removing the children" from the foster home, either to return to their mother or to be adopted by strangers (Id., p. 11) in view "of the especially strong and sustaining bond which the children so openly express with their foster mother." (Id. p. 12.)
On September 6, 1991 the evaluator testified that it would be detrimental to wait longer than the nearly four years that these children — now nearly 8 and 6 years old — have already waited for a permanent home. He found in the mother no sign that her situation would change, that she could rehabilitate her life to the point of being able to relate to or care for these boys. He found the children to be very fragile and strongly attached to the foster parents and regarded it as an "experiment with their fragility" if they were required to participate in an increased visitation plan that at best would contain only "a faint hope" for reunification. He recommended adoption by the foster family, notwithstanding the foster mother's age (early 60's), finding her "very competent" to finish the task of raising these boys who had been so damaged physically, emotionally and socially when first placed in her care. (State's Exhibit B., p. 4.) He recommended no contact with their mother since any contact could be easily misunderstood by these fragile children as an effort to reunify with her, causing their bond with the foster family to deteriorate. He found it noteworthy that when asked why she had seen her boys just twice in more than two years, her first response was not the difficulty of transportation. First she responded angrily "Why you ask?" and claimed she had just been "trying to get my life together . . . I'm here and there . . ." When she finally added that the distance was a problem in visiting, she gave no reason why she had also failed to phone CT Page 527 or send mail or gifts.
When asked her plans for after the birth of the baby who was born in August of 1991, she first questioned the question, asking "Such as what: I don't understand." At last she said "I hope to get my girls back" but nothing was said about these boys or about marrying the father of her unborn child. The psychologist, in summary, saw no sign of change in Ethel in the three years between evaluations.
Robert T. Sr. who had cared for the boys shortly before their mother requested foster placement for them in January of 1988, had appeared at the initial hearing on the neglect petitions on those children on January 21, 1988, but had not visited them, contacted DCYS or appeared in court since that date.
Adjudication — On Facts as of February 26, 1991
Absent any updating amendment to the pleadings, grounds for terminating parental rights must be determined on facts as of February 26, 1991, the date these petitions were filed. Father — His total absence from the children's life and unavailability to their legal guardians supports, by clear and convincing evidence, all three non-consensual grounds pleaded for terminating the father's rights:
1. Abandonment — not only in the statutory sense, but in the common law sense of a total and complete intended absence from the children's life, can be supported by this record.
2. Failure to Rehabilitate — Robert T. Sr. was actually closer to being his son's caretaker in April of 1988, when his son was committed to DCYS, than he was three years later when this petition was filed.
He had lived with his son and in January of 1988 had asked for help with his care when Ethel left him with the child and could not be contacted. Since this occurred, however, he has completely dropped out of the life of his son and DCYS. This record supports, by clear and convincing evidence, that he has failed to achieve such degree of personal rehabilitation as would support a reasonable expectation that he could, within a period of time consistent with the child's best interest, resume primary caretaking responsibilities.
3. No ongoing Parent-Child Relationship — It does not take a clinical expert to conclude that whatever relationship a father might have with a seven year old son after three years with no contact, it could not be that relationship that ordinarily CT Page 528 develops as a result of a parent having met every essential need of the child on a daily basis. That fact alone, of course, is not grounds to terminate parent's rights. Based upon the unexplained and total lack of manifested interest in his son for this extended period of time, it is equally clear and convincing that to permit still further time to establish or reestablish such relationship would be inconsistent with the best interests of Robert T. Jr.
Mother — The placement of these children in a foster home — albeit an excellent one — in Cromwell, inaccessible to ready bus transportation, without offering at least transportation for monthly visits, is such a barrier to regular contact with the children as to preclude a finding of abandonment.
It is conceded by the mother that she did not phone or write letters or send gifts in this period, but those contacts alone, while manifesting interest, could not by themselves keep a relationship alive. Ethel's failure to visit was due in large measure to the location of the foster home and the lack of assistance in visiting her children there. She accepted every offer of a ride to the foster home; there were but two such offers in three years.
2. Failure to Rehabilitate — As of the adjudicatory date, Ethel had secured housing in her own name, had manifested no signs of continued drug and alcohol abuse, had apparently remained free of arrests and incarcerations. The expectations of the court had never required counselling, either individual or for substance abuse. Apart from her failure to visit, she had fulfilled all of the court's expectations at the time of commitment. Had DCYS amended its pleadings prior to the last hearing, the situation might have been different: By September of 1991 she had apparently lost her own apartment and was living with her latest boyfriend; she was expecting her seventh out-of-wedlock child; with pending termination petitions she had not increased her contacts with her son to any significant degree. But without such amendment, these facts, which accrued after February 26, 1991, must be deemed dispositional only.
3. No on-going Parent-Child Relationship: The clinical evaluation of May 1991 is unequivocal that no such relationship existed between Ethel and these boys.
They could not remember her name, what she looked like. They did not express joy upon seeing her after 21 months, nor sorrow upon parting from her. They appeared to have no present memories or positive feelings for her. Nothing in the mother's conduct or in the clinical evaluation suggests that the future CT Page 529 will hold anything different than did the last three years. After more than three years in foster care, considering their condition when first placed, their strong positive bond with the foster family and their still fragile states, it is clear and convincing that to permit still further time for the reestablishment of a parent-child relationship would be highly detrimental to the best interest of both children.
Disposition — As of September 6, 1991 (Last Trial Date)
Between the adjudicatory date (February 26, 1991) and the dispositional date (September 6, 1991) changes in Ethel's life took her further from reunification with Robert Jr. and Michael. She had given up the apartment she had acquired in her own name in August of 1990 to move in with a 52-year-old boyfriend whom she had no plans to marry. She had become pregnant, giving birth to her seventh out-of-wedlock child in August of 1991. She was still preoccupied with "getting her life together" when speaking with the psychologist about her lack of contact for three years.
Before the court may consider terminating parental rights, however, it must consider the six factors set forth in subsection (d) of 17a-112.
None of these have relevance to Robert T. Sr. whose absence from the life of his son and from DCYS was uninterrupted since Robert T. Jr.'s placement. An agency cannot make efforts to rehabilitate, a court cannot issue orders or articulate expectations, to a parent whose whereabouts are unknown. While Ethel's whereabouts were known for much, if not all, of the period of placement of these children, she initiated no efforts on her own part to be reunited with them: She stopped requesting visitation. She did not call or send cards, letters or gifts at Christmas or the children's birthdays. In her interview with the psychologist she did not give lack of transportation as the principal reason for turning her back on these boys, but rather the difficulty of getting her own life together. Asked for her plans for the future she, significantly, spoke of reunification with her daughters — two older half-siblings of Robert Jr. and Michael — not with her sons. While the efforts of DCYS between January of 1988 and the filing of petitions were minimal, at best, it does not appear that more vigorous efforts in this direction would have made any significant difference: She did not visit her daughters much more often than she did the two boys in question, although there was no transportation problem involved. She was given a clear "road map" for regaining custody of the baby born to her in February of 1988, and made so little effort in this direction that termination of her CT Page 530 parental rights was ordered when that child was less than three years old.
She was never denied visitation when she requested assistance with transportation, and the placement of these children in another town where transportation presented a difficulty was not unreasonable considering the extreme neediness of both children at the time of placement, the necessity of placing them together with a foster mother of extensive experience, and the importance of not interrupting a successful foster placement unnecessarily. Indeed, although represented by counsel in every hearing since January 21, 1988, and having filed, through such counsel, a motion for more visitation regarding the baby born in 1988, she never requested such assistance regarding these boys, nor was there any evidence that she had ever asked that they be placed closer to Hartford, or that they be transported by DCYS to visit her in Hartford. While DCYS may have been remiss in making "reasonable efforts" to reunite Ethel with her two sons, Ethel made no visible efforts on her own behalf to this same end.
At the ages of nearly eight and six-and-one-half, these children, now bonded to and thriving under the care of their foster family of nearly four years, need the assurance of permanency before they enter the turbulence of latency and puberty. It would have been far better for them had their placement been assured such permanence before they entered the wide world of public school, and, indeed, DCYS had ample grounds to initiate a terminate action two years before it did so. But any further delay would be clearly detrimental to their well-being.
Therefore it is ORDERED that the parental rights of Ethel R. in and to her sons Robert T., Jr. and Michael R., and the parental rights of Robert T. Sr. in and to his son Robert T., Jr. be, and hereby are terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing these children in adoption as soon as it is in their best interests to do so, in accordance with the clear recommendation of the clinical psychologist who has twice evaluated this family. Such Commissioner is further ORDERED to submit to this court a written report as to the progress toward such adoption no later than 90 days after the date of this judgment, and thereafter at such times and in such forms as may from time to time be required. If these children, or either of them, are not finally adopted by May 1, 1993, said Commissioner is further ORDERED to file a Motion for Review of Terminated Child with this court, to be in accordance with federal law, no later than that date so that the plan may be reviewed in court and on the record within 18 months of the CT Page 531 judgment.
Appeal
The parents have 20 days from the date of this judgment in which to take an appeal. If they request an appeal and their trial counsel is willing to represent them, this court will appoint that attorney to act as appellate counsel at public expense until all appellate process is completed. Practice Book #4017. If however, in the exercise of professional judgment as an officer of the Superior Court, the attorney declines to perfect such appeal because, in the attorney's opinion, it lacks merit, he is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Practice Book #4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The parties will then be informed by the court clerk that they have the balance of the 40 days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke,152 Conn. 501 (1965).
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of a third party involved: those of the child whose interest to at least as great a degree of consideration as those of the parent whose right to raise the child is at issue.
Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process, which could take years, is exhausted.
Entered at Hartford this 21st day of January, 1991.
FREDERICA S. BRENNEMAN, JUDGE